UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>v.<br><br>SINISTER MANUFACTURING<br>COMPANY, INC.<br><br><br><br><br><br>     Defendant. | Civil Action No. 23-737 |

## COMPLAINT

The United States of America ("United States"), by authority of the Attorney General of the United States and the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as follows:

### NATURE OF THE ACTION

1. This is a civil action brought under Sections 203, 204, and 205 of the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. § 7522–7524, seeking injunctive relief and the assessment of civil penalties against Sinister Manufacturing Company, Inc. ("Sinister" or "Defendant") for violations of the CAA related to Defendant's manufacture and sale of aftermarket products for

1

motor vehicles or motor vehicle engines.

## I.  JURISDICTION

2. This Court has jurisdiction over the subject matter of and the parties to this action pursuant to 42 U.S.C. §§ 7523 and 7524, and 28 U.S.C. §§ 1331, 1345, and 1355.

3. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. §§ 1391(b)(2), 1391(c)(2) and 1395(a), as well as 42 U.S.C. § 7524, because it is the judicial district in which the Defendant is located, resides, is doing business, and/or in which a substantial part of the alleged violations in the Complaint occurred.

## II.  DEFENDANT

4. Brian P. George founded Sinister Mfg. Company, LLC in 2010.

5. In April 2011, Sinister Mfg. Company, LLC filed to change its name to Sinister Manufacturing Company, Inc. and registered as a limited liability company in California.

6. The registered address for Sinister is 2025 Opportunity Drive, Suite 7, Roseville, CA 95678.

7. Sinister is a "person" within the meaning of Section 302(e) of the CAA, 42 U.S.C. § 7602(e).

## III.  BACKGROUND

8. This action arises under Title II of the CAA, as amended, 42 U.S.C. §§ 7521–7590, and the regulations thereunder relating to the control of emissions of air pollution from motor vehicles and motor vehicle engines.

### A.  Statutory and Regulatory Objectives

9. In creating the CAA, Congress found that "the increasing use of motor vehicles

. . . has resulted in mounting dangers to the public health and welfare." 42 U.S.C. § 7401(a)(2). Congress's purposes in creating the Act were "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," and "to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution." 42 U.S.C. § 7401(b)(1)–(2).

10. "Motor vehicle" is defined as "any self-propelled vehicle designed for transporting persons or property on a street or highway." 42 U.S.C. § 7550(2); 40 C.F.R. § 85.1703.

11. Title II of the CAA and the regulations promulgated thereunder establish stringent standards for the emissions of air pollutants from motor vehicles and motor vehicle engines that "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a). These pollutants include, but are not limited to particulate matter ("PM"), nitrogen oxides ("$NO_x$"), non-methane hydrocarbons ("NMHCs"), and carbon monoxide ("CO"). 42 U.S.C. § 7521(a)(3)(A).

12. EPA has also established National Ambient Air Quality Standards for certain pollutants, including ozone, $NO_x$, PM, and CO. *See* 40 C.F.R. §§ 50.1–50.19.

13. PM is a form of air pollution composed of microscopic solids and liquids suspended in air. PM is emitted directly from motor vehicles and is also formed in the atmosphere from the emission of other pollutants, including from motor vehicles.

14. Ozone is a highly reactive gas that is formed in the atmosphere from emissions of other pollutants, including from motor vehicles.

15. $NO_x$ and NMHCs are reactive gasses that contribute to the formation of PM and ozone.

16. Exposure to PM and ozone is linked to respiratory and cardiovascular health effects as well as premature death. Children, older adults, people who are active outdoors (including outdoor workers), and people with heart or lung disease are particularly at risk for health effects related to PM or ozone exposure.

17. CO is a highly toxic gas that can cause headaches, dizziness, vomiting, nausea, loss of consciousness, and death. Long-term exposure to CO has been associated with an increased risk of heart disease.

### B. Acts Prohibited by the Clean Air Act, 42 U.S.C. § 7522(a)(3)(B)

18. Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B), makes it a prohibited act for "any person to manufacture or sell, or offer to sell, or install any part or component intended for use with, or as a part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use."

19. Persons violating Section 203(a)(3)(B) of the Act, 42 U.S.C. § 7522(a)(3)(B), are subject to injunctive relief pursuant to 42 U.S.C. § 7523.

20. Persons violating Section 203(a)(3)(B) of the Act, 42 U.S.C. § 7522(a)(3)(B), are subject to civil penalties of up to $3,750 for each violation occurring on or after January 13, 2009, through November 2, 2015, and up to $4,735 for each violation occurring after November 2, 2015, and assessed on or after January 15, 2019, in accordance with Sections 204(a) and 205(a) of the CAA, 42 U.S.C. §§ 7523(a) and 7524(a). 40 C.F.R. § 19.4 (2018).

21. Pursuant to 42 U.S.C. § 7524(a), each part or component manufactured, sold,

offered for sale, or installed in violation of the Section 203(a)(3)(B) of the Act, 42 U.S.C. § 7522(a)(3)(B), is a separate violation.

### C. EPA's Certificate of Conformity Program for New Motor Vehicles and Motor Vehicle Engines

22. Manufacturers of new motor vehicles or motor vehicle engines must apply for and obtain a certificate of conformity ("COC") from EPA to sell, offer to sell, or introduce or deliver for introduction into commerce any new motor vehicle or motor vehicle engine in the United States. 42 U.S.C. § 7522(a)(1).

23. To obtain a COC, the original equipment manufacturer ("OEM") must demonstrate that the motor vehicle or motor vehicle engine will conform to established emissions standards for PM, NOx, NMHC, CO, and other pollutants during a motor vehicle or motor vehicle engine's useful life. 42 U.S.C. § 7525(a)(2); *see* 40 C.F.R. §§ 86.007-30(a)(1)(i), 86.1848-01(a)(1).

24. The COC application must describe, among other things, the emission-related elements of design of the motor vehicle or motor vehicle engine. *See* 40 C.F.R. § 86.094-21(b)(1) ("The application . . . shall include the following: . . . a description of [the vehicle's] . . . emission control system and fuel system components."); *see also* 40 C.F.R. § 86.1844-01(d)–(e).

25. Once issued by EPA, a COC only covers those new motor vehicles or motor vehicle engines that conform in all material respects to the specifications provided to EPA in the COC application for such vehicles or engines. 40 C.F.R. § 86.1848-01(c)(6).

### D. Elements of Design in Motor Vehicles and Motor Vehicle Engines

26. An "element of design" is "any control system (i.e., computer software, electronic control system, emission control system, computer logic), and/or control system calibrations,

and/or the results of systems interactions, and/or hardware items on a motor vehicle or motor vehicle engine." 40 C.F.R. § 86.1803-01.

27. OEMs install a variety of hardware and software elements of design in motor vehicles and motor vehicle engines that control emissions of pollutants in order to comply with the CAA and obtain certification, hereinafter referred to as "Emission-Related Elements of Design."

28. Pursuant to 42 U.S.C. § 7521(m), the OEM is required to install an Onboard Diagnostics ("OBD") System on motor vehicles that must monitor, detect, and record malfunctions of all monitored Emission-Related Elements of Design. 40 C.F.R. §§ 86.007-17, 86.010-18, 86.1806-05.

29. The OBD System monitors and detects malfunctions of Emission-Related Elements of Design through a network of sensors installed throughout the motor vehicle and motor vehicle engine.

30. When the OBD System detects a malfunction of an Emission-Related Element of Design, it must illuminate the vehicle's Malfunction Indicator Light ("MIL") on the dashboard. *See* 40 C.F.R. § 86.1806-05(b)–(d).

31. The OBD System is an Emission-Related Element of Design.

32. Exhaust Gas Recirculation ("EGR") Systems are Emission-Related Elements of Design that reduce $NO_x$ emissions by recirculating exhaust gas through the engine, thereby reducing engine temperature and $NO_x$ emissions.

33. "Aftertreatment" refers collectively to the Emission-Related Elements of Design "mounted downstream of the exhaust valve . . . whose design function is to reduce emissions in the engine exhaust before it is exhausted to the environment." *See* 40 C.F.R. § 1068.30. Diesel

6

Particulate Filters ("DPFs"), Diesel Oxidation Catalysts ("DOCs"), Selective Catalytic Reduction ("SCR") Systems, and $NO_x$ Adsorption Catalysts ("NACs") are all part of Aftertreatment.

34. Aftertreatment Emission-Related Elements of Design are contained in OEM-installed, stock exhaust pipes.

35. DPFs are Emission-Related Elements of Design that reduce the level of PM pollution contained in engine exhaust gas.

36. DOCs are Emission-Related Elements of Design that reduce CO and NMHC emissions by promoting the conversion of those pollutants into less harmful gases.

37. SCR Systems are Emission-Related Elements of Design that reduce $NO_x$ emissions by chemically converting exhaust gas that contains $NO_x$ into nitrogen and water through the injection of diesel exhaust fluid.

38. NACs are Emission-Related Elements of Design that reduce $NO_x$ emissions by chemically adsorbing $NO_x$ from exhaust gas.

39. OEMs set software parameters, also known as calibrations, that control, among other things, engine combustion and Aftertreatment performance (hereinafter referred to as "Certified Stock Calibrations"). 40 C.F.R. §§ 86.1803-01.

40. OEMs disclose Certified Stock Calibrations on their application for a COC for each vehicle model because they are part of a motor vehicle's overall emissions control strategy. Certified Stock Calibrations that must be included on the COC application include "fuel pump flow rate, . . . fuel pressure, . . . EGR exhaust gas flow rate, . . . and basic engine timing." 40 C.F.R. § 86.1844(e)(2); *see also* 40 C.F.R. pt. 85 app. VIII (listing vehicle and engine parameters and specifications); 40 C.F.R. pt. 86 app. VI (listing vehicle and engine components). Certified

7

Stock Calibrations are Emission-Related Elements of Design.

41. Oxygen Sensors are Emission-Related Elements of Design that detect the ratio of air to fuel during fuel combustion. An imbalanced air-to-fuel ratio can result in increases in $NO_x$ or NMHCs.

42. Motor vehicles are equipped with Electronic Control Units ("ECUs"), which are computers that monitor and control vehicle operations, including the operation of Emission-Related Elements of Design described in Paragraphs 27–41. OBD Systems and other Emission-Related Elements of Design operate in conjunction with ECUs.

43. The Emission-Related Elements of Design described in Paragraphs 2727–41 are installed in motor vehicles or motor vehicle engines in compliance with Title II of the CAA and the regulations thereunder. *See, e.g.*, 42 U.S.C. § 7521 (setting emission and OBD standards and directing EPA to establish standards by regulation); 40 C.F.R. § 86.007-11 (establishing emission standards for 2007 and later diesel heavy-duty engines and vehicles); 40 C.F.R. § 86.1844-01(d)–(e) (listing information requirements for COC applications, including calibration information); 40 C.F.R. § 86.004-25(a)(6) (defining "critical emissions-related components").

### E. The Types of Aftermarket Performance Products at Issue

44. Defendant has manufactured, sold, offered for sale, and/or installed products that are designed to alter, replace, or disable OEM-installed elements of design, including Emission-Related Elements of Design, in order to enhance a vehicle's power, improve a vehicle's fuel economy, or reduce the costs related to operating and maintaining a vehicle's Emission-Related Elements of Design (hereinafter "Aftermarket Performance Products").

45. Aftermarket Performance Products' effect on vehicle power, vehicle fuel

economy, or Emission-Related Elements of Design maintenance costs is derived from their effect of bypassing, defeating, or rendering inoperative devices or Emission-Related Elements of Design.

### 1. *Hardware Defeat Devices*

46. Some of Defendant's Aftermarket Performance Products are Hardware Defeat Devices that physically interfere with or replace Emission-Related Elements of Design (hereinafter, "Hardware Defeat Devices").

47. Some of Defendant's Hardware Defeat Devices interfere with (including via bypass or removal) exhaust recirculation in the EGR System. These products use blocker/block-off plates, replacement tubes, or other hardware to interfere with the recirculation of exhaust gas back into the engine combustion chamber, thereby defeating or rendering inoperative the vehicle's EGR System.  These Hardware Defeat Devices are hereinafter referred to as "EGR Delete Hardware Defeat Devices."

48. Some of Defendant's Hardware Defeat Devices (hereinafter referred to as "Engine Emission Control Delete Hardware Defeat Devices") interfere with (including via bypass or removal) other Emission-Related Elements of Design located on or adjacent to the engine block.  These include "grid heater delete kits" and "smog pump eliminators". For example:

    a. Grid Heater Delete Hardware Defeat Devices render inoperative the heating element found in certified configurations on certain highway vehicles, which heats exhaust gases to promote catalyst efficiency; and

    b. Smog pump eliminators remove and/or disable the smog pump, which is designed to inject air into the exhaust stream ahead of the catalytic

converters to promote more complete combustion of hydrocarbons in the exhaust stream.

49. Some Hardware Defeat Devices interfere with (including via bypass or removal) Aftertreatment Emission-Related Elements of Design by, for example, removing the DOCs, DPFs, NACs, OBD Sensors, and/or SCR System. These are sometimes referred to as "delete pipes" or "straight pipes." These Hardware Defeat Devices are hereinafter referred to as "Aftertreatment Delete Hardware Defeat Devices."

### 2. Tuners and Tunes

50. Some of Defendant's Aftermarket Performance Products are electronic software products (hereinafter, "Tunes") that alter or overwrite aspects of a motor vehicle's ECU and/or OBD System.

51. Tunes can be stored and transmitted in numerous ways by other Aftermarket Performance Products, including electronically through email and through electronic storage devices (hereinafter, "Tuners").

52. Some Tunes manipulate the ECU and/or OBD System to bypass, defeat, or render inoperative Emission-Related Elements of Design, including Certified Stock Calibrations, EGR System, DPFs, DOCs, SCR System, and/or other Aftertreatment. Other Tunes electronically disable or allow for the full physical removal of Emission-Related Elements of Design, including by working in conjunction with Hardware Defeat Devices to manipulate the monitoring function of the OBD System so that it will fail to detect the new Hardware Defeat Devices and the removal of one or more of a vehicle's Emission-Related Elements of Design.

53. Defendant sold Tuners that were preloaded with Tunes that had a principal effect of bypassing, defeating, or rendering inoperative devices or Emission-Related Elements of

Design ("Subject Tuners").

## IV. GENERAL ALLEGATIONS

54. Defendant manufactures, sells and/or offers to sell products intended for use in "motor vehicles" as that term is defined by the Act, 42 U.S.C. § 7550(2), and regulations promulgated thereunder at 40 C.F.R. § 85.1703.

55. Defendant manufactures, sells, and/or offers to sell Aftermarket Performance Products that it advertises or otherwise represents to the public as enhancing a motor vehicle's power or performance, modifying a motor vehicle's fuel economy, or reducing the costs associated with operating and maintaining a motor vehicle's emission control system.

56. A principal effect of Defendant's Aftermarket Performance Products, including both Hardware Defeat Devices and Subject Tuners, is to bypass, defeat, or render inoperative devices or Emission-Related Elements of Design.

57. Defendant sells and/or offers to sell Aftermarket Performance Products over the internet through its website, other websites, and through sales to other retailers that sell the products to consumers.

58. Defendant manufactured, sold, and/or offered for sale Aftermarket Performance Products for diesel trucks nationwide between October 30, 2015 and at least July 17, 2017.

59. Upon information and belief, Defendant has manufactured, sold, and offered to sell, Aftermarket Performance Products from July 17, 2017 to the present day.

60. Defendant recommended to the public to use its Aftertreatment Delete Hardware Defeat Devices to "replace your diesel truck's full exhaust system or just make improvements one section at a time".... to "enhance overall performance" .... For "Powerstroke, Duramax, or Cummins engine..."

61. Defendant advertised its "EGR Delete" products with the statement that, "with the EGR system removed, you'll no longer be cycling hot exhaust into your intake, lowering overall intake temperatures and making more power and more torque on track."

62. Defendant advertised its "Grid Heater Delete" products with the claim that "if you live in a warmer climate or have a deleted EGR system, take advantage of our Sinister Diesel 5.9 Cummins Grid Heater Delete and 6.7 Cummins Throttle Valve Delete.  Removing these obstructions will dramatically improve the CFM flow in your Cummins air intake system, increasing boost levels and making more power you can use."

63. Defendant advertised Subject Tuners as follows: "One of the simplest ways to increase your horsepower and torque numbers is with a plug-in diesel tuner from Sinister Diesel."

64. On April 29, 2016, EPA inspectors conducted an unannounced inspection of Sinister's sales and distribution center in Roseville, California.

65. During the April 29, 2016 inspection, Defendant's representatives acknowledged that Sinister sells automotive performance and fix it parts, Hardware Defeat Devices including EGR delete kits and delete pipes, and software products including Subject Tuners.

66. Mr. George also stated during the inspection that the majority of Sinister's Hardware Defeat Devices are designed and manufactured in house.

67. Mr. George stated that approximately 80% of Sinister's customers are buying products for diesel vehicles and approximately 20% are buying products for gas vehicles.

68. Mr. George also stated that most of Sinister's business is engine components for diesel trucks, with a lot of products for use with the 6.0L Ford Powerstroke.

69. The EPA inspection team observed a manufacturing and product development

workshop area of the facility.

70. The EPA inspection team also observed the inventory/long term product storage areas that included a variety of Hardware Defeat Devices including:

      a. EGR delete kits for many different make/model applications;

      b. Grid heater delete kits; and

      c. DPF delete pipes.

71. On June 30, 2017, EPA issued a Request for Information to Sinister pursuant to Section 208(a) of the CAA, 42 U.S.C. § 7542(a), that sought information regarding Sinister's manufacture and/or sale of Aftermarket Performance Products since January 1, 2016 ("Information Request").

72. On July 28, 2017, Defendant provided a spreadsheet in response to EPA's Information Request documenting its manufacture and/or sale of Hardware Defeat Devices including EGR delete kits, delete pipes, crankcase vent kits, grid heater delete kids, smog pump eliminators, as well as Subject Tuners.

73. Defendant's July 28, 2017 response to EPA's information Request, which was signed and certified by George, also included step-by-step installation instructions for several Hardware Defeat Devices. These installation instructions include explicit instructions on how to remove or bypass Emission-Related Elements of Design, including the EGR system, and air intake heater system (i.e., grid heater).

74. All 39,792 of the exhaust components that Defendant manufactured and sold between October 30, 2015 and July 17, 2017, identified in its response to EPA's Information Request, are Aftermarket Performance Products, i.e., they are designed to bypass, defeat, or render inoperative devices or elements of design on diesel trucks that control emissions of

regulated air pollutants, and are defeat devices.

75. Based on evidence gathered during the April 29, 2016 inspection and Defendant's July 18, 2017 response to EPA's Information Request, EPA issued a Notice of Violation ("NOV") on June 5, 2018 to Sinister stating that Sinister had "manufactured for sale, sold, and/or installed from October 30, 2015 to July 17, 2017 products that have the principal effect of altering or bypassing emission control systems or elements of design on motor vehicles or engines, primarily light-duty diesel trucks and engines, manufactured by entities such as FCA US LLC and its predecessors ('FCA'), General Motors Co. ('GM'), and Ford Motor Co. ('Ford')."

## V. FIRST CLAIM FOR RELIEF
*Violations for the Manufacture, Sale and/or Offering for Sale of Hardware Defeat Devices*

76. The United States re-alleges Paragraphs 1-75 above as if fully set forth herein.

77. Between October 30, 2015 to July 17, 2017, Defendant manufactured, sold and/or offered for sale at least 37,829 Hardware Defeat Devices, including:

   a. At least 35,960 EGR Delete Hardware Defeat Devices;

   b. At least 244 Engine Emission Control Delete Hardware Defeat Devices, including at least 236 grid heater delete kits and 8 smog pump eliminators; and

   c. At least 1,625 Aftertreatment Delete Hardware Defeat Devices (e.g., straight pipes).

78. Upon information and belief, Defendant has continued to sell Hardware Defeat Devices from July 17, 2017 to the present day.

79. Each Hardware Defeat Device that Defendant manufactured, sold, and/or offered

for sale is intended for use with certified motor vehicles and motor vehicle engines.

80. Defendant knew or should have known that the Hardware Defeat Devices it sold were offered for sale or installed for such use or put to such use.

81. A principal effect of each Hardware Defeat Device that Defendant manufactured, sold, and/or offered for sale is to bypass, defeat, or render inoperative one or more of a vehicle's Emission-Related Elements of Design.

82. Defendant knew or should have known that the Hardware Defeat Devices it sold were offered for sale or installed to bypass, defeat, or render inoperative devices or elements of design that control emissions of regulated air pollutants.

83. Each unit of the Hardware Defeat Devices that Defendant manufactured, sold, offered for sale, or installed is a separate violation of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B). 42 U.S.C. § 7524(a).

84. Unless enjoined, Defendant is likely to continue to manufacture, sell, offer for sale, or install Hardware Defeat Devices.

85. Defendant is liable to the United States for injunctive relief and civil penalties of up to $3,750 for each violation of Section 203(a)(3)(B) occurring on or after January 13, 2009, through November 2, 2015, and injunctive relief and civil penalties of up to $4,619 for each violation of Section 203(a)(3)(B) occurring after November 2, 2015, and assessed on or after January 15, 2018, in accordance with Sections 204(a) and 205(a) of the CAA, 42 U.S.C. §§ 7523(a) and 7524(a). 40 C.F.R. § 19.4 (2018).

## VI. SECOND CLAIM FOR RELIEF
*Violations for the Manufacture, Sale, and/or Offering for Sale of Subject Tuners*

86. The United States re-alleges Paragraphs 1– 85 above as if fully set forth herein.

87. Between October 30, 2015 and July 17, 2017, Defendant sold and/or offered for sale at least 1,963 Subject Tuners.

88. The Subject Tuners Defendant sold or offered for sale are intended for use with certified motor vehicles and motor vehicle engines.

89. Defendant knew or should have known the Subject Tunes it sold were offered for sale or installed for such use or put to such use.

90. A principal effect of one or more component(s) of each Subject Tuner sold or offered for sale by Defendant is to bypass, defeat, or render inoperative one or more of a vehicle's Emission-Related Elements of Design.

91. Defendant knew or should have known that the Subject Tuners it sold and/or offered for sale were being offered for sale or installed to bypass, defeat, or render inoperative devices or elements of design that control emissions of regulated air pollutants.

92. Each Subject Tuner sold, offered for sale, or installed and intended for use with, or as a part of, any motor vehicle or motor vehicle engine is a separate violation of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B). 42 U.S.C. § 7524(a). Unless enjoined, Defendant is likely to continue to manufacture, sell, offer for sale, or install Subject Tuners.

93. Defendant is liable to the United States for injunctive relief and civil penalties of up to $3,750 for each violation of Section 203(a)(3)(B) occurring on or after January 13, 2009, through November 2, 2015, and injunctive relief and civil penalties of up to $4,619 for each violation of Section 203(a)(3)(B) occurring after November 2, 2015, and assessed on or after January 15, 2018, in accordance with Sections 204(a) and 205(a) of the CAA, 42 U.S.C. §§ 7523(a) and 7524(a). 40 C.F.R. § 19.4 (2018).

**RELIEF REQUESTED**

WHEREFORE, the United States respectfully requests that this Court:

A. Assess civil penalties against Defendant for its violations of Section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B), in the amount of up to $3,750 for each violation occurring after November 1, 2013 through November 2, 2015, and up to $4,735 for each violation occurring after November 2, 2015;

B. Permanently enjoin Defendant from manufacturing, selling, offering to sell, or installing motor vehicle parts or components intended for use with a motor vehicle or motor vehicle engine where a principal effect of such part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with Title II of the CAA;

C. Order the Defendant to take other appropriate actions to remedy, mitigate, and offset the harm caused by its alleged CAA violations;

D. Award the United States its costs and disbursements in this action; and

E. Award such other and further relief as the Court may deem just and proper.

Respectfully submitted,

TODD S. KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*/s/ Eric Albert*
ERIC ALBERT
Trial Attorney
JOANNA CITRON DAY
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington D.C. 20044-7611
(202) 514-3211
Eric.albert@usdoj.gov

Of counsel:
DAVID H. KIM
Attorney-Advisor
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, CA 94105